# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| ANNE KAWAS and PAUL KAWAS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:20-CV-138 |
| | ) | |
| JAMES SPIES, DARLENE SPIES, | ) | |
| and DUDLEY DO SSI, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court are Plaintiffs' and Defendants' motions for summary judgment. Dkt. Nos. 29, 36.  For the reasons stated below, Plaintiffs' motion, dkt. no. 29, is **DENIED**.  Defendants' motion, dkt. no. 36, is **GRANTED** as to Plaintiffs' claims for (1) active concealment of water intrusion, (2) active concealment of foundation damage, (3) willful concealment of bulkhead and erosion issues and (4) active concealment of bulkhead and erosion issues and **DENIED** as to all other claims.

## BACKGROUND

### A. Factual Background

This case arises out of Plaintiffs Anne and Paul Kawas's purchase of a house on Saint Simons Island from Defendants James and Darlene Spies.

James and Darlene Spies purchased a house on Saint Simons Island (the "Property") from Nancy and Robert Butler in 2012. Dkt. No. 36-1 ¶ 1; Dkt. No. 46 ¶ 1. The Property bordered Dunbar Creek, a tidal creek. Dkt. No. 29-1 ¶ 11; Dkt. No. 39-1 ¶ 11. During the sale, the Butlers disclosed that the Property had experienced water intrusion problems in the past. Dkt. No. 29-1 ¶ 2; Dkt. No. 39-1 ¶ 2. The Spieses testified that they did not ask what specific water intrusion problems the Butlers experienced nor what efforts the Butlers undertook to control the water intrusion. Dkt. No 36-4 at 13:21–14:25; Dkt. No. 36-2 at 28:3–10, 31:4–25. Rather, the Spieses left the details of the due diligence investigation to the local realtor they used. Dkt. No. 36-4 at 14:7–25, 15:1-4, 16:3-8.

Darlene Spies testified that the day the Spieses closed on the Property she "noticed a small puddle of water in the garage" and "some outlets on the patio that looked like they should have been inspected a little better." Dkt. No. 36-4 at 16:24-17:2. She stated, however, that they "wiped up the water and never saw it again" so she "never thought of it to be an issue." Dkt. No. 36-4 at 17:7–9; see also id. at 17:10-15 (similar); id. at 18:7-17 (explaining that Darlene Spies noticed a container of cat litter next to the garage door and assumed it was to clean up small puddles, for example, those coming from an automobile).

2

After the Spieses moved in, however, they had "[a] problem with [] mold and [] water in the garage" and rot under the house due to water intrusion. Dkt. No. 36-5 at 52:3–6; Dkt. No. 36-2 at 31:8–32:24 (referring to water intrusion in the basement five to six months after purchasing the house); Dkt. No. 36-5 at 52:3–6, 53:1–9 (referring to mold, water, and rot issues that Darlene Spies reported finding around the house). In their depositions, the Spieses provided conflicting testimony about any subsequent steps they took to fix water intrusion issues. Dkt. No. 36-5 at 17:8–20, 19:3–20 (Darlene Spies discussing her husband's prior deposition testimony, for which she was present, indicating that repairs were made to prevent water intrusion); Dkt. No. 36-5 at 20:6–21:2 (Darlene Spies testified that she chose to have green moss removed from the outer walls for landscaping reasons, not to prevent water intrusion); Dkt. No. 36-5 at 21:3–6 ("Q: [A contractor named] Koldewey attempted to fix the garage walls to prevent water intrusion in May and June of 2013, didn't he? [Darlene Spies]: Okay. Yes."); Dkt. No. 36-5 at 21:7–18 (indicating that water problems discussed with a contractor were "outside . . . . Not in the inside of the building"); Dkt. No. 36-5 at 21:19–22:6 (questioning Darlene Spies about her disagreement with her husband's prior testimony, which suggested that even after the outer wall was fixed, the garage floor was still wet); Dkt. No.

36-5 at 22:13-23:9 (claiming that the work done by their repairman "was not due to water intrusion" but rather "a find when we took the vine off the wall" which "did not intrude into the house at that time" and insisting that "there was never any water intrusion from the time [Darlene Spies] mopped up the small [puddle]"); Dkt. No. 36-2 at 37:2-14 (James Spies testified that he "believe[d]" his wife "did eradicate" the water intrusion issue he had referred to in his prior deposition); No. 36-2 at 37:15-23 (similar).

The Spies sued their broker in a previous lawsuit concerning the property. Dkt. No. 36-1 ¶ 7; Dkt. No. 46 ¶ 7. In the lawsuit against the broker, Darlene Spies testified that there was mold on a wall in the garage, dkt. no. 36-4 at 20:24-22:12, dkt. no. 36-5 at 51:22-52:6, and that the Spieses had to replace a door and doorframe in the basement because it was rotting, dkt. no. 36-4 at 77:25-79:21. She later disputed these claims. Id. at 19:24-24:23 (alleging that there was "crystallization," not mold, in the house and that mold was a word their lawyers had used); 36-5 at 28:10-29:7 (stating that the door did not close properly, not that it was rotted on the inside or water damaged). Darlene Spies's email exchanges with a contractor also indicate that there was standing water outside the house, the wall going from the garage to the third floor was "saturated" with water, and there was a threat of greater intrusion if the contractor did not address the drainage

issues. Dkt. No. 36-2 at 172–73. Darlene Spies maintains that water never entered the house and that the wall was only saturated with water on the outside. Dkt. No. 36-4 at 100:18–101:7; Dkt. No. 36-5 at 21:7–22:24. The Spieses then completed multiple repairs to fix the possible water intrusion problems. Dkt. 36-4 at 102:7–13 (stating that the Spieses installed a French drain, gutters, and piping).

The parties do not dispute that the Spieses found structural and foundational problems at the Property. Dkt. No. 29-1 ¶ 8; Dkt. No. 39-1 ¶ 8. The Spieses hired a contractor to address these foundational issues. Dkt. No. 36-4 at 94:14–17, 96:18–97:22. The Spieses also renovated the Property by landscaping, painting, replacing countertops and bathroom vanities, and installing a new shower and toilets. Dkt. No. 36-1 ¶ 2; Dkt. No. 46 ¶ 2;[1] Dkt. No. 29-1 ¶ 32; Dkt. No. 39-1 ¶ 32 (disputing only the implication that

---

[1] At various points in their response to the Spieses's statement of material facts, the Kawases suggest that they "are without knowledge or information sufficient to form a belief as to the accuracy of [a given] statement [of fact,] and as such deny the statement." Dkt. No. 46 ¶¶ 2, 10, 11, 14. That is not an effective response at this stage of the proceedings, so those facts are deemed admitted. See Fed. R. Civ. Pro. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the records . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ."); L.R. 56.1, S.D. Ga. ("All material facts set forth in the statement [of material facts] will be deemed to be admitted unless controverted by a statement served by the opposing party."); Mobley v. U.S. Gov't, No. 5:19-CV-116, 2021 WL 5854271, at *1 n.1 (S.D. Ga. Dec. 9, 2021) ("[A] plaintiff who 'lacks information' to dispute a fact at summary judgment essentially concedes that the statement is, in fact, undisputed.").

the Spieses put in shrubs and performed landscaping to cover defects).

The Property suffered land erosion along the creek. Dkt. No. 36-1 ¶ 3; Dkt. No. 46 ¶ 3. To address the erosion, the Spieses built a bulkhead, which was completed around April 2013. Dkt. No. 36-1 ¶ 3; Dkt. No. 46 ¶ 3; Dkt. No. 29-1 ¶¶ 12-13; Dkt. No. 39-1 ¶¶ 12-13. Around April 2014, the Spieses's neighbor's bulkhead failed. Dkt. No. 36-1 ¶ 4; Dkt. No. 46 ¶ 4. Since the neighbor's bulkhead was attached to the Spieses's bulkhead, the Spieses decided to rebuild their bulkhead.[2] Dkt. No. 36-2 at 75:11-17, 77:4-6. The Spieses hired a contractor to examine the bulkhead, and he advised them to install a helical anchoring system to remedy the issue. Dkt. No. 36-3 at 52:6-12, 70:9-13, 140 (showing the contractor's recommendations, including "new helical anchors"). The contractor told the Spieses that a "catastrophic failure" of the bulkhead could occur if the work was not done immediately. Dkt. No. 36-3 at 52:6-12, 53:22-161:1, 140. The repairs began in the fall of 2014, dkt. no. 36-1 ¶ 6; dkt. no. 46 ¶ 6 (disputing the term "bulkhead" instead of "seawall" and "repair" instead of

---

[2] The Kawases dispute that the two bulkheads were connected, arguing that James Spies detached the Spieses's seawall from the neighbor's seawall. Dkt. No. 46 ¶ 5; Dkt. No. 36-2 at 92:1-7 (James Spies testifying he "took a chain saw and cut [them] off from the neighbor."); id. at 93:1-25 (stating that the neighbor's seawall "could have pulled [their] wall down at any time" and "[t]hat's why we disconnected from it").

"rebuild," but not disputing that the work occurred in fall 2014),
but the Spieses decided to use tie-backs instead of the helical
anchoring system, dkt. no. 29-1 ¶ 17; dkt. no. 39-1 ¶ 17 (disputing
only wording, not the fact that the Spieses did not use the helical
anchoring system); Dkt. No. 36-3 at 71:23-72:3. Once the repairs
were completed, the Spieses put sod against the bulkhead and the
surrounding area. Dkt. No. 36-3 at 41:2-16 (stating that, at some
unknown date, a picture was taken showing that there was no sod
against the seawall); Dkt. No. 36-3 at 42:12-18 (stating that, in
April 2014, a picture was taken showing sod all the way to the
seawall).

The Spieses then filed a lawsuit against their realtor's
brokerage company due to erosion-related issues. Dkt. No. 36-1
¶ 7; Dkt. No. 46 ¶ 7. The Spieses lost at summary judgment because
the court found, among other things, that they failed to exercise
due diligence. Dkt. No. 36-1 ¶¶ 8-9; Dkt. No. 46 ¶¶ 8-9; see also
Spies v. Deloach Brokerage, Inc., 169 F. Supp. 3d 1365, 1377-79
(S.D. Ga. 2016). After the lawsuit concluded, the Spieses began to
lease the Property.[3] Dkt. No. 36-1 ¶ 10; Dkt. No. 46 ¶ 10. About
a year later, the Kawases approached the Spieses and made an offer

---

[3] The Spieses also deeded the property to Defendant Dudley Do SSI, LLC. The
parties have stipulated, however, that no claims or defenses would be made for
or against the LLC. Dkt. No. 36-1 ¶ 11; Dkt. No. 46 ¶ 11; Dkt. No. 45 at 17
n.25. Accordingly, to the extent Plaintiffs' complaint alleges any claims
against Dudley Do SSI, LLC, those claims are **DISMISSED**.

on the Property. Dkt. No. 36-1 ¶¶ 10, 28; Dkt. No. 46 ¶¶ 10, 28. The Property was not listed for sale at the time of the offer. Dkt. No. 36-1 ¶ 12; Dkt. No. 46 ¶ 12. The Kawases learned of the Property from a realtor who recommended it to them. Dkt. No. 36-1 ¶ 14; Dkt. No. 46 ¶ 14.

Paul and Anne Kawas are experienced property owners, owning approximately five properties. Dkt. No. 36-1 ¶ 20; Dkt. No. 46 ¶ 20. Paul Kawas is a civil litigator, and Anne Kawas is a certified public accountant. Dkt. No. 36-1 ¶¶ 17-19; Dkt. No. 46 ¶¶ 17-19. The Kawases are from New York, but they have owned a property on Saint Simons Island and spent time in the area since 2006. Dkt. No. 36-1 ¶¶ 16, 21; Dkt. No. 46 ¶¶ 16, 21.

Prior to closing, the Kawases conducted multiple visual inspections of the Property. Dkt. No. 29-1 ¶ 35; Dkt. No. 39-1 ¶ 35. The Kawases had an architect visit the Property to ensure that they could build an addition to the house, and the architect brought an engineer. Dkt. No. 45 at 20; Dkt. No. 36-7 at 15:5-9, 32:5-33:1; Dkt. No. 36-6 at 44:2-4, 66:3-24. The Kawases also hired a home inspector, and Paul Kawas accompanied the home inspector during his inspection. Dkt. No. 29-1 ¶¶ 36-37; Dkt. No. 39-1 ¶¶ 36-37. The inspector compiled a report and did not discover the interior defects the Kawases now allege. Dkt. No. 29-1 ¶¶ 38-39; Dkt. No. 39-1 ¶¶ 38-39. The inspector's report excluded "seawalls,"

8

"latent or concealed defects," "structural, geological, soil, wave action or hydro-logical stability, survey, engineering, analysis or testing," and mold from the scope of the inspection. Dkt. No. 36-1 ¶ 55; Dkt. No. 46 ¶ 55.

At the Kawases's request, the Spieses provided Disclosure Statements regarding the condition of the Property. Dkt. No. 36-1 ¶ 38; Dkt. No. 46 ¶ 38.[4] The second disclosure statement form required explanations for any questions answered affirmatively in the first disclosure statement. Dkt. No. 36-1 ¶ 39. In response, the Spieses represented that they were not aware (1) that there was at the time, or had been at any prior time, any water intrusion issues or repairs; (2) of any damage from fungi or dry rot at the time of the disclosure; (3) that there had been any settling, movement, cracking or breakage of the foundation or structural supports; (4) that there were any other hidden defects. Dkt. 31-5 at 2-4. The Spieses also indicated affirmatively on the first disclosure statement that there had been "additions, structural changes, or any other major alterations" to the Property. Id. at 2. In an addendum, the Spieses explained this answer by writing that they had "discovered that land along the creek had started to

---

[4] The Spieses provided two property disclosure statements, both signed by the Spieses. Dkt. No. 36-2 at 174-201; Dkt. No. 36-2 at 192-99. The second disclosure statement contained more information than the first one, and both parties appear to agree that it controls the transaction. See, e.g., Dkt. No. 29-1 ¶ 27; Dkt. No. 39-1 ¶ 27.

erode," so they "put in the bulkhead [to] regain lost land and not lose any further [sic] to erosion." Dkt. No. 31-5 at 8. According to the addendum, the Spieses then "sought restitution from [the realtor]" but "were hometowned and lost in the Georgia court system." Id. The Spieses mentioned in the addendum neither the issues they had faced with nor the repairs they had made to the bulkhead. Id.

Both parties agree that the Kawases read and understood both disclosure statements before closing. Dkt. No. 36-1 ¶ 42; Dkt. No. 46 ¶ 42. The Kawases did not ask any follow-up questions about the addendum. Dkt. No. 36-1 ¶ 43; Dkt. No. 46 ¶ 43. Sometime before or after the Kawases received the addendum, Paul Kawas Googled the prior lawsuit and found records about it online. Dkt. No. 36-1 ¶¶ 44–45; Dkt. No. 46 ¶¶ 44–45; Dkt. No. 35 at 14:49:1-10; id. at 15:53:3. The summary judgment order in the previous case discusses the Spieses's "discovery of the erosion problem," the surveys the Spieses had conducted, and one surveyor's conclusion that the area had "eroded substantially since 1994." Dkt. No. 36-1 ¶ 46; Dkt. No. 46 ¶ 46. After his research, Paul Kawas requested a copy of the elevation certificate that the prior suit mentioned, but he did not take further action to investigate any erosion or bulkhead issues. Dkt. No. 36-1 ¶ 47; Dkt. No. 46 ¶ 47.

In July 2019, the Kawases accepted the Spieses's counteroffer to buy the Property for $800,000 and signed the Purchase and Sale Agreement (the "Agreement"). Dkt. No. 36-1 ¶¶ 29-31, 74; Dkt. No. 46 ¶¶ 29-30, 74. The Kawases acknowledge that they read and understood the Agreement before they signed it. Dkt. No. 36-1 ¶ 31; Dkt. No. 46 ¶ 31. The Agreement contained three pertinent provisions. First, it provided a due diligence period of fourteen days, during which the Kawases could decide whether they wanted to proceed with the sale. Dkt. No. 36-6 at 256. Failing to terminate the sale during the due diligence period would result in the Kawases' accepting the Property "as is," subject only to the terms of the Agreement itself. Dkt. No. 36-1 ¶ 35; Dkt. No. 46 ¶ 35. Second, the Agreement granted the Kawases the right "to inspect, examine, test, appraise, and survey property." Dkt. No. 36-1 ¶ 32 (quoting Dkt. No. 36-6 at 31:23-24); Dkt. No. 46 ¶ 32. Third, the Agreement stated that the buyer—the Kawases—had the "sole duty" to become familiar with neighborhood conditions that could affect the Property. Dkt. No. 36-1 ¶ 33 (quoting Dkt. No. 36-6 at 31:3-6); Dkt. No. 46 ¶ 33.

The sale closed in early October 2019. Dkt. No. 36-1 ¶ 74; Dkt. No. 46 ¶ 74. After the Kawases moved into the house, they discovered water intruding at the bottom of the garage stairwell and in the finished garage area. Dkt. No. 29-1 ¶¶ 41-42; Dkt. No.

39-1 ¶¶ 41-42. To determine the source of the water, they removed paneling from the cinderblock walls in the garage and found water stains, mold, saturated insulation, and water-damaged sheetrock. Dkt. No. 29-1 ¶ 43; Dkt. No. 39-1 ¶ 43. They also removed the baseboard around the paneling in the finished area of the garage, where they discovered mold, rot, and rusted nails. Dkt. No. 29-1 ¶ 44; Dkt. No. 39-1 ¶ 44. Several weeks after the Kawases moved into the Property, sink holes began developing behind the bulkhead, which indicated that it was failing. Dkt. No. 29-1 ¶ 45; Dkt. No. 39-1 ¶ 45. The Kawases allege that the Spieses covered up these defects by: placing sod on the bulkhead; painting over the mold, rot, and cracked caulking; replacing a rotting door; and covering damaged areas with wooden paneling, baseboards, and a wooden platform. Dkt. No. 1 ¶¶ 14-17, 19, 21; Dkt. No. 30 at 15. The Kawases continued renovating the Property after discovering the damage. Dkt. No. 36-1 ¶¶ 75-78; Dkt. No. 46 ¶¶ 75-78 (disputing only the specific renovations that were done, not that they renovated).

**B. Procedural Background**

Anne and Paul Kawas filed this suit against James Spies, Darlene Spies, and Dudley Do SSI, LLC. Dkt. No. 1 at 1-2. The Kawases allege that the Spieses committed fraud and misrepresentation by concealing various defects on the Property. Dkt. No. 1 at 1.

During discovery, the Kawases submitted testimony from a real estate appraiser to determine the fair market value of the Property without defects. Dkt. No. 32-1 at 2; Dkt. No. 51 at 1. The Spieses did not challenge the validity of this portion of the expert's opinion. Dkt. No. 51 at 2. The expert also performed a "paired sales analysis" to determine the discounted value of the Property with the alleged defects. Id. The Magistrate Judge excluded the expert's testimony on the "paired sales analysis." Dkt. No. 51 at 2, 11–12.

The Kawases now move for partial summary judgment on the Spieses's liability for fraud and compensatory damages. Dkt. No. 29 at 2. The Spieses move for summary judgment on all the Kawases's claims and for full, reasonable attorney's fees and expenses under the Agreement. Dkt. No. 36 at 1.

## LEGAL STANDARD

When ruling on cross-motions for summary judgment, the Court will view the facts "in the light most favorable to the non-moving party on each motion." James River Ins. Co. v. Ultratec Special Effects Inc., 22 F.4th 1246, 1251 (11th Cir. 2022) (citing Chavez v. Mercantil Commercebank, N.A., 701 F.3d 896, 899 (11th Cir. 2012)). Cross-motions for summary judgment do not, in and of themselves, require the Court to grant summary judgment to any party. U.S. v. Oakley, 744 F.2d 1553, 1555–56 (11th Cir. 1985) (quoting Bricklayers Int'l Union, Loc. 15 v. Stuart Plastering

Co., 512 F.2d 1017, 1023 (5th Cir. 1975)). Rather, summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the Court that there is an absence of evidence to support the nonmoving party's case. See id. at 325.

If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta,

2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.

Where the nonmovant attempts to carry this burden with nothing "more than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

The Kawases move for summary judgment on the Spieses' liability for fraud and compensatory damages. Dkt. No. 29 at 2. In their complaint, the Kawases allege that the Spieses either willfully, actively, or passively concealed five interior defects: (1) water intrusion, (2) mold, (3) rot, (4) a hole, and (5) foundational issues. Dkt. No. 1 ¶¶ 14-20. The Kawases also appear to allege that the Spieses concealed two interrelated exterior defects: a defective bulkhead and erosion issues. Id. ¶ 21. Lastly, the Kawases allege they are entitled to attorney fees under O.C.G.A. § 13-16-11, dkt. no. 1 ¶ 27, and punitive damages under O.C.G.A. § 13-6-11, dkt. No. 1 ¶ 28. The Spieses, in contrast, move for summary judgment on all the Kawases's claims and argue that they are entitled to attorney fees and expenses under the

Agreement. See generally Dkt. No. 36; see also id. at 25. Because both parties filed motions for summary judgment, the Court will consider disputed facts in the light most favorable to each non-movant, in turn.

### A. Fraud

A fraud claim requires "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." Lehman v. Keller, 677 S.E.2d 415, 417–18 (Ga. Ct. App. 2009) (quoting Meyer v. Waite, 606 S.E.2d 16, 20 (Ga. Ct. App. 2004)).[5] There are three species of real estate fraud: willful misrepresentation, active concealment, and passive concealment. Spies, 169 F. Supp. 3d at 1374. To say that a person committed fraud by willful misrepresentation is simply to say that they accomplished the fraud by "tell[ing] a lie." Id. at 1374 (quoting Hoffman v. Fletcher, 535 S.E.2d 849, 851 (Ga. Ct. App. 2000)). Active concealment, in turn, refers to a fraud where the seller "did not discuss the [relevant] defect" directly enough to constitute a lie, "but instead took steps to prevent its discovery." Id. at 1377 (citing Hudson v. Pollock, 598 S.E.2d 811, 814 (Ga. Ct. App 2004)). Finally, passive concealment is a fraud "where the seller does nothing to prevent the discovery," as in

---

[5] The Spieses contend that Georgia law governs the Kawases's fraud claims, dkt. no. 36 at 12 n.100, and the Kawases do not appear to dispute that conclusion, see generally dkt. no. 45.

active concealment, "but simply keeps quiet about a defect which" is "known to the seller" but not "readily discernible." Id. at 1374 (quoting Hoffman, 535 S.E.2d at 851). "In cases of passive concealment by the seller [or agent] of defective realty, the buyer must prove that the vendor's concealment of the defect was an act of fraud and deceit, including evidence that the defect could not have been discovered by the buyer by the exercise of due diligence and that the seller [or agent] was aware of the problems and did not disclose them." Ben Farmer Realty Co. v. Woodard, 441 S.E.2d 421, 423-24 (Ga. Ct. App. 1994) (quoting U-Haul Co. of W. Ga. v. Dillard Paper Co., 312 S.E.2d 618, 621 (Ga. Ct. App. 1983)).

"In all cases of fraud involving concealment of a material fact, there must be some evidence that the defendants had actual knowledge of the concealed fact"—but since "fraud is inherently subtle," a plaintiff "may survive summary judgment if there is slight, circumstantial evidence of such knowledge." Fann v. Mills, 546 S.E.2d 853, 858 (Ga. Ct. App. 2001) (quoting Quill v. Newberry, 518 S.E.2d 189, 193 (Ga. Ct. App. 1999)); see also Tabor v. Orkin Exterminating Co., 360 S.E.2d 34, 37 (Ga. Ct. App. 1987) ("[T]he alleged[ly] defrauded party must show that the alleged defrauder had actual, not merely constructive, knowledge'" (quoting Butler v. Terminix Int'l, Inc, 334 S.E.2d 865, 867 (Ga. Ct. App. 1985))); compare Napier v. Kearney, 855 S.E.2d 78, 82-83 (Ga. Ct. App. 2021) (rejecting the inference that the sellers knew of flooding based

on the buyer's experience that the backyard flooded after heavy rain; a shed was located on a deck and not in the backyard where the flooding occurred; and an engineer's opinion that drainage problems would have been noticeable for several years prior because the buyers "failed to point to evidence that the property actually flooded while [the seller] owned it or that he had knowledge of any flooding") with Browning v. Stocks, 595 S.E.2d 642, 644-45 (Ga. Ct. App. 2004) ("[T]he evidence was sufficient for the jury to find that [the seller] defrauded [the buyer] because," despite denying knowledge of termite damage, a contractor discovered that putty had been used to conceal holes and gaps in the wood and an entomologist concluded the damage itself would have taken two years to accumulate); and Fann, 546 S.E.2d at 858-59 (finding enough evidence to create a fact issue on knowledge where the sellers' agent arranged for a wood infestation report and had access to the results showing suspected termite activity but "chose not to divulge their knowledge" to the buyer). Because slight, circumstantial evidence of such knowledge is sufficient to survive summary judgment, it is often "'the province of the jury to pass on these circumstances showing fraud.'" Fann, 546 S.E.2d at 858 (quoting Quill, 518 S.E.2d 193).

### 1. Water Intrusion

A few weeks after they moved into the house, the Kawases discovered water damage in the garage. Dkt. No. 29-1 ¶¶ 41-42. The

Kawases allege that the Spieses willfully concealed evidence of
water intrusion by denying on their initial disclosure form that
"there [was at the time] or has [] been any water intrusion in the
basement . . . or other parts of any dwelling" or "repairs [] made
to control water intrusion in the basement . . . or other parts of
any dwelling." Dkt. No. 31-5 at 3; Dkt. No. 30 at 7. The Kawases
further allege that the Spieses actively concealed water intrusion
by covering damage beneath baseboards, wooden paneling, and a
wooden platform. Dkt. No 30 at 8-9; Dkt. No. 1 ¶¶ 14-15, 19. To
support these contentions, the Kawases point to the water damage
they found in the garage, the Spieses's testimony from their
previous lawsuit discussing water damage, and various emails
between Darlene Spies and her contractor about standing water and
the threat of water intrusion. Dkt. No. 30 at 9. The Kawases appear
to argue that, because the Spieses previously knew about water
intrusion issues, the Spieses must have known about the water
intrusion the Kawases later discovered and, thus, the Spieses must
have attempted to cover it up. Dkt. No. 30 at 9. Failing all else,
the Kawases allege that the Spieses passively concealed water
intrusion. The Spieses, in turn, argue that there is no evidence
they ever saw or concealed water damage in those places. Dkt. No.
36 at 15. Rather, the Spieses insist that the standing water they
previously found was always confined to the outside of the house
and they made the necessary repairs to prevent water intrusion in

the house, dkt. no. 36-4 at 100:18–101:7; dkt. no. 36-5 at 21:7–
22:24, dkt. no. 36-4 at 102:7-13, such that "the problem was in
the past and had been resolved," Stephen A. Wheat Trust v. Sparks,
754 S.E.2d 640, 646 (Ga. Ct. App. 2014).

### i.   The Spieses's Motion for Summary Judgment

#### a. Willful Concealment

Considering the Spieses's motion for summary judgment, there
is a genuine issue of material fact as to whether the Spieses
willfully concealed water intrusion in the house. The Spieses
denied that there had ever been any water intrusion into the house.
Dkt. No. 36-4 at 100:18–101:7; Dkt. No. 36-5 at 21:7–22:24. In one
of the emails between Darlene Spies and her contractor, however,
the contractor states that "the whole wall was saturated" with
water.[6] Dkt. 36-2 at 171. "Saturated" can mean "[p]ermeated with
moisture, thoroughly soaked." Saturated, Oxford English Dictionary
(2022); see also Saturated, Merriam-Webster Unabridged (2022)
("[S]teeped in moisture; completely penetrated"). Taking all
inferences in the light most favorable to the Kawases as the non-
moving party, a reasonable jury could infer that the contractor's
statement means the Spieses experienced water intrusion into the

---

[6] Among other observations and recommendations, the contractor noted that "the
ground was saturated right next to the footer in the middle," dkt. no. 36-2 at
171, that a "french drain" was "useless for drainage," dkt. no. 36-2 at 170,
that "[t]he water level was almost up to the stucco wall . . . with 6 inches to
spare. [It] looks like a mini moat . . . we've got to figure out a way to get
drainage because water will find a way [in] if we don't." Dkt. No. 36-2 at 172.
Darlene Spies also sent an email to the contractor stating: "yes, we have
standing water again next to the house." Dkt.  36-2 at 173.

house. If this were the case, the Spieses's statement that there had not been any water intrusion into the house would be a "lie" constituting willful concealment. <u>Spies</u>, 169 F. Supp. 3d at 1374. Thus, a genuine issue of material fact exists on the issue of willful concealment of water intrusion, and the Spieses are **DENIED** summary judgment on this issue.

### b. Active Concealment

Even taking all inferences in favor of the Kawases, there is no evidence creating a genuine issue of fact as to whether the Spieses actively concealed water intrusion.

In <u>Napier v. Kearney</u>, 855 S.E.2d 78, 83 (Ga. Ct. App. 2021), the court held that the plaintiff had provided sufficient evidence that the defendant actively concealed water damage to survive a motion for summary judgment. The plaintiff presented evidence that a refrigerator had been moved to a different location before the plaintiff's home inspection and that the refrigerator and rugs covered water damage in the house during the inspection. <u>Id.</u> at 83. The Kawases contend that their finding water damage beneath baseboards, wooden paneling, and a wooden platform similarly raises an inference that the Spieses actively concealed water intrusion. The court in <u>Napier</u>, however, rejected the inference that the sellers knew of flooding based on the buyer's experience that the backyard flooded after heavy rain, the fact that a shed was located on a deck and not in the backyard where the flooding

occurred, and an engineer's opinion that drainage problems would have been noticeable for several years prior. Id. at 81. According to the court, the plaintiff's experience with flooding did not demonstrate that the sellers had similarly experienced flooding, the plaintiff's inference based on the placement of the shed was conjecture, and the engineer did not opine that the drainage problems would cause actual flooding. Id. at 82.

Like the flooding evidence in Napier, the evidence of water damage beneath the baseboards, wooden paneling, and a wooden platform in this case, without more, cannot raise an inference that the Spieses knew about the water damage and attempted to conceal it. The fact that the Kawases found water damage does not mean that the Spieses also found it. Further, the placement of the baseboards, wooden paneling, and wooden platform on its own does not raise an inference of knowledge. Unlike the refrigerator and rugs in Napier, the baseboards and wooden paneling are immovable once installed, and the Kawases have offered no evidence that these features were recently installed. The wooden platform, too, is more like the shed in Napier than the rugs and refrigerator in Napier because the Kawases have offered no evidence that the platform or any other nearby furniture was moved before the Kawases's inspection. Therefore, the Spieses's motion for summary judgment is **GRANTED** as to Kawases's claim for active concealment of water intrusion.

### c. Passive Concealment

Next is the Kawases's claim for passive concealment of water intrusion.  As addressed above, an issue of material fact exists regarding whether the Spieses had knowledge that water intrusion into the house had occurred at any time prior to the sale of the Property. And, since the Kawases walked the Property multiple times and hired an inspector, dkt. no. 29-1 ¶¶ 35–37, dkt. no. 39-1 ¶¶ 35–37, there is also evidence that the Kawases conducted sufficient inspections to create a jury issue on due diligence. Spies, 169 F. Supp. 3d at 1378 (passive concealment requires, *inter alia*, evidence that the defect could not have been discovered by the buyer by the exercise of due diligence). Accordingly, the Spieses's motion for summary judgment is **DENIED** as to the Kawases's claim of passive concealment of water intrusion.

### ii.  The Kawases's Motion for Summary Judgment

### a.  Active and Passive Concealment

Because the Kawases's claim for active concealment of water intrusion fails, see supra, their motion for summary judgment as to that claim is **DENIED.** Also, because a jury question exists as to the Spieses's knowledge of water intrusion and the sufficiency of the Kawases's due diligence, the Kawases's motion for summary judgment is **DENIED** as to passive concealment, as well.  Thus, the Court need address their motion for summary judgment only as to their claim for willful concealment of water intrusion.

### b. Willful Concealment

Taking all inferences in favor of the Spieses, the Kawases are unable to show that no question of material fact exists as to the Spieses's willful concealment of water intrusion. Even though the contractor's email states that a wall was "saturated" with water, Darlene Spies maintains that the water was always confined to the outside of the house and that she made the necessary repairs to prevent intrusion into the house, such that "the problem was in the past and had been resolved." Stephen A. Wheat Trust, 754 S.E.2d at 646. Evidence that a threat of water intrusion existed and repairs were made does not raise the inference that the Spieses unequivocally knew that water intrusion damage occurred after they made the necessary repairs. The contractor also references exterior—not interior—renovations that were needed to address the issues he found. Dkt. No. 36-2 at 171. A reasonable jury could credit Darlene Spies's testimony and find that the Spieses did not experience water intrusion into the house while they lived there. Therefore, the Spieses would not have "lied" when they stated on their disclosure that they had never experienced water intrusion issues. Since a genuine fact issue remains, the Kawases's motion for summary judgment is **DENIED** as to their claim for willful concealment of water intrusion.

### 2. Foundational and Structural Issues

The Court now moves on from the Kawases's allegations of water intrusion/damage concealment to structural and foundational damage concealment.[7]  The Kawases allege that the Spieses "concealed with wood paneling on the first level of the home . . . structural damage to the stairwell walls between levels one and two and levels two and three of the home." Dkt. No. 1 ¶ 1.  The Kawases also argue the Spieses did not disclose garage foundation issues and repairs. Dkt. No. 30 at 10 (citing the Spieses's depositions regarding previous garage foundation repair); Dkt. No. 29-2 at 26-27.  On their disclosure form, the Spieses indicated there had not been "any structural reinforcements or supports added." Dkt. No. 36-2 at 193.

#### i.   The Spieses's Motion for Summary Judgment

##### a. Stairwell Damage

The same analysis regarding the Kawases's allegations that the Spieses actively concealed water intrusion with wooden paneling and baseboards applies to the Kawases's allegations about concealment of structural damage to the stairwell walls. Even taking the facts in the light most favorable to the Kawases, there is no evidence indicating the Spieses knew about the structural

---

[7] The Kawases refer to structural and foundational issues as separate defects apart from water damage and water intrusion, see dkt. no. 30 at 10, so we do the same here.

damage to the stairwell walls, much less evidence that the wooden paneling was recently placed over the damage.

First, there is some deposition testimony indicating that when the Spieses first moved into the house, their home inspector stated the house needed "[s]ome minor wall repair [] in [the] stairwell at the first flight." Dkt. No. 36-4 at 44:5-8. Darlene Spies states that the inspector was referring to a "small crack" on the wall which they repaired by painting over it. Dkt. No. 36-4 at 45:2-9; Dkt. No. 36-4 at 47:12-13. The Kawases have offered no evidence indicating that this "minor wall repair" was indicative of later, more widespread, structural damage nor that the Spieses's repair was inadequate. Second, the Kawases cite one statement by James Spies from the prior lawsuit that "the house has several major structural issues" to support their claim. Dkt. No. 36-2 at 23:18-23. However, the Spieses seem to use the term "structural" to refer to issues related to the bulkhead and erosion. See Dkt. No. 36-2 at 193, 199 (stating that there have been "additions, structural changes, or other major alterations to the original improvements or Property," explaining the erosion and bulkhead installation issues, and referring to the Spieses's previous lawsuit); see also Spies, 169 F. Supp. 3d at 1371-72 (discussing only that the Spieses found water damage, mold, rot, and erosion, with no mention of interior structural issues). James Spies's single statement, when taken in context, without more, does not

raise an inference that the Spieses knew about the structural damage to the stairwell walls. Third, the Kawases also point to the fact that Paul Kawas later found structural damage when he removed the wooden paneling. Dkt. No. 36-6 at 146:10-147:7. However, as with the water damage claim, evidence that there was damage behind wooden paneling without any indication when the paneling was placed does not raise an inference that the Spieses knew of the damage. Thus, the Spieses's motion for summary judgment is **GRANTED** as to the Kawases's claims for willful, active and passive concealment of structural issues with regard to the stairwell.

### b. Foundation Damage

Next, the Kawases argue they are entitled to summary judgment as to the Spieses's willful, active and passive concealment of foundation issues. See Dkt. No. 1 ¶¶ 19, 23; Dkt. No. 30 at 10.

### I.   Willful Concealment

There is evidence that the Spieses's contractor did "foundational work around the foundation and garage and stairwell walls" on the exterior of the house. Dkt. No. 36-4 at 105:16-21. Specifically, the Spieses's contractor added several pours of concrete to repair the foundation Dkt. No. 36-4 at 100:8-101:3; Dkt. No. 36-4 at 138 (discussing the pouring done to repair the foundation). The Spieses did not disclose this information to the Kawases, dkt. no. 36-4 at 108:10-18, stating on the disclosure

form that there had not been any structural reinforcements or supports added. Dkt. No. 36-2 at 193. And because the Kawases found structural damage in the house, dkt. no. 1 ¶ 19, a jury could reasonably infer that the Kawases suffered damages from the Spieses's nondisclosure. As with water intrusion, this evidence creates at least a triable issue of fact on whether the Spieses willfully concealed this defect because the statements on the disclosure forms might be "lie[s]." Spies, 169 F. Supp. 3d at 1377. Thus, the Spieses's motion for summary judgment is **DENIED** on the issue of willful concealment of foundation defects.

## II.  Active Concealment

Besides the Spieses' statements on the disclosure forms, which could constitute willful—not active—concealment, the Kawases have not presented evidence that the Spieses "took steps to prevent [] discovery" of the foundation repairs. Spies, 169 F. Supp. 3d at 1377 (citing Hudson, 598 S.E.2d at 814); Dkt. No. 30 at 10 (discussing only foundation defects and repairs that Spieses did not disclose). Thus, the Spieses's motion for summary judgment is **GRANTED** on the issue of active concealment of foundation defects.

## III. Passive Concealment

Because the Spieses failed to disclose the repairs they made to the foundation, a jury could find that they passively concealed foundational and structural issues. Therefore, the Spieses's

28

motion for summary judgment on passive concealment of structural and foundational issues is also **DENIED.**

### i.   The Kawases's Motion for Summary Judgment

#### a.  Stairwell Damage

As discussed supra, even taking all inferences in favor of the Kawases, they have not demonstrated a genuine issue of material fact on the Spieses's knowledge of the structural damage to the stairwell walls. Therefore, the Kawases's motion for summary judgment is **DENIED** as to concealment of the stairwell damage.

#### b.  Foundation Damage

Taking all inferences in favor of the Spieses, the Kawases cannot show there is no question of material fact as to the Spieses's concealment of foundation issues.

### I.   Willful Concealment

The Spieses did disclose that there had "been [] additions, structural changes, or any other major alterations to the original improvements or [p]roperty . . . ." Dkt. No. 36-2 at 193. They did not, however, disclose details about the foundational repairs in their Addendum. Dkt. No. 36-2 at 199. Nevertheless, the Spieses could argue that they did not tell a "lie" on the disclosure form because of the affirmative statement. The Spieses could also argue that the failure to disclose the foundational repairs was not material or that the Kawases suffered no damages because the issue was entirely resolved by the contractor's work. Therefore, there

is an issue of material fact regarding the Spieses willful concealment of foundation defects, and the Kawases's motion for summary judgment is **DENIED** on this issue.

## II. Active Concealment

As discussed <u>supra</u> regarding active concealment of foundation damage, the Kawases do not allege that the Spieses "took steps to prevent [] discovery" of the foundation repairs. <u>Spies</u>, 169 F. Supp. 3d at 1377 (citing <u>Hudson</u>, 598 S.E.2d at 814); <u>see</u> Dkt. No. 30 at 10 (stating only that the Kawases did not disclose foundation defects and repairs). Thus, the Kawases's claim for active concealment of foundation defects fails, and their motion for summary judgment is **DENIED** on the issue.

## III. Passive Concealment

The Spieses did not disclose their foundation repairs, dkt. no. 36-2 at 192–99, which could arguably constitute passive concealment. As with willful concealment, though, a jury could reasonably find that the Spies's nondisclosure was not material or that the Kawases suffered no damages as a result of the nondisclosure. Therefore, the Kawases's motion for summary judgment is **DENIED** on the issue of passive concealment of foundation defects.

### 3. Mold and Rot

The Kawases argue that the Spieses willfully, actively, and passively concealed mold and rot inside the house. Dkt. No. 1

30

¶¶ 13-17, 23. On their disclosure form, the Spieses stated that there was not "any damage . . . by fungi or dry rot." Dkt. No. 36-2 at 194.[8] The Kawases allege that after they moved into the house, they found mold and rot when they removed wooden paneling from cinderblock walls in the garage and paneling and a baseboard in the finished area of the garage. Dkt. No. 29-1 ¶¶ 43-44. The Kawases also allege they found mold and rot in the garage concealed under a wooden platform; mold on the first level ceiling; and rotted wood and cracked caulking on the first level of the home. Dkt. No. 1 ¶¶ 14-17. To support these contentions, first, the Kawases seem to argue that the Spieses knew that there was mold and rot in the house at the time of the sale because the Spieses had experienced issues with mold and rot in the past. The Spieses dispute they ever had mold and rot issues in the past. Dkt. No. 36-4 at 19:24-24:23, Dkt. No. 36-5 at 28:10-29:7. Second, Paul Kawas also stated that the Kawases believed the Spieses had covered the mold on the ceiling because "it appeared" "that [sic] [a] particular piece of sheetrock was placed in after the other work was done on the ceiling because it was a different shape and . . . size than the other pieces that abutted it." Dkt. No. 36 at 15

---

[8] Note that the question on the disclosure form about mold and rot differs from the question about water intrusion. The mold and rot question asked: "[i]s there any damage . . . by fungi or dry rot," indicating that the Spieses should disclose whether, at the time of the disclosure, there currently was any damage. Dkt. No. 36-2 at 194. In contrast, the water intrusion question asked: "[i]s there now *or has there been* any water intrusion . . . ." Id. (emphasis added). Thus, the temporal analysis of the Spieses's knowledge of mold and rot differs from the analysis of their knowledge of water intrusion.

(quoting Dkt. No. 35 at 37:140:2-11). The Kawases also state that they remember there was "bright white paint" over the areas where mold later grew, which they argue suggests that the Spieses painted over mold to conceal it before the Kawases moved in. Dkt. No. 34 at 12:39:20-40:5. In response, the Spieses argue that the Kawases have offered no evidence that the Spieses actually knew that there was mold at the time of the sale and that the Kawases's contentions rest only on "speculation." Dkt. No. 36 at 24.

### i.  The Spieses's Motion for Summary Judgment

#### a. Willful and Active Concealment

Taking all inferences in favor of the Kawases, the Kawases have presented enough evidence that the Spieses knew mold and rot was present at the time the Spieses sold the house to create a genuine issue of material fact as to concealment. First, the Spieses argue that there is no evidence creating an issue that they were aware of mold on the ceiling. Instead, the Spieses contend that the Kawases merely offer a "personal observation" that "it appeared" "that [sic] [a] particular piece of sheetrock was placed in after the other work was done on the ceiling because it was a different shape and . . . size than the other pieces that abutted it." Dkt. No. 36 at 15 (quoting Dkt. No. 35 at 37:140:2-11). This assessment is meaningless, the Spieses protest, because Paul Kawas also admitted he "has no experience at all" with sheetrock. Dkt. No. 36 at 15 (quoting Dkt. No. 35 at 37:140:12-

141:9). There is, however, no suggestion that Paul Kawas's observation falls outside the realm of ordinary experience, such that the Kawases would need an expert. His observation may be unreliable, but it is not clear why it should be discounted as a matter of law. Paul Kawas's observation about the sheetrock placement, at least arguably, offers insight into *when* the sheetrock was placed there, and thus raises an arguable inference regarding *why* it was placed there.

Similarly, the Kawases state that there was "bright white paint" over the mold and rot they discovered, which suggests the house had been recently painted. Dkt. No. 34 at 12:39:20-40:5.[9] Although the Kawases do not know when the house was most recently painted, dkt. no. 34 at 12:40:6-8, the appearance of fresh paint over areas where mold was later discovered at least permits the inference that the Spieses saw the mold and rot and painted over it to conceal it. Cf. Browning v. Stocks, 595 S.E.2d 642, 644-45 (Ga. Ct. App. 2004) (finding that "the evidence was sufficient for the jury to find that [the seller] defrauded [the buyer] because," despite denying knowledge of termite damage, a contractor

---

[9] The Kawases also appear to argue that the Spieses painted over cracked caulking, which concealed further evidence of either water damage or rot. Dkt. No. 36-6 at 143:15-25 (noting a gap on either side of the baseboard with "unusual[ly]" wide caulking to cover that the baseboard "was eaten away by water"); Dkt. No. 1 ¶ 17 ("Defendants concealed rotting wood and cracked caulking on the first level of the home by covering the defect with paint."); Dkt. No. 30 at 15 (arguing that the Spieses "caulked and painted around baseboards where there was rot"). Regardless of whether the Kawases are arguing the caulking concealed water damage, rot, or was a defect in and of itself, the same reasoning above applies.

discovered that putty had been used to conceal holes and gaps in the wood and an entomologist concluded the damage itself would have taken two years to accumulate).

There is also evidence, while disputed, that the Spieses noticed mold and rot during their ownership of the house. See Dkt. No. 36-4 at 20:24–21:17 (discussing Darlene Spies's sworn testimony to that effect in a prior deposition); Spies, 169 F. Supp. 3d at 1371 ("During the walk-through, Spies noticed several issues with the house . . . . She noticed mold on the wall . . . . Spies noticed the damage because of her discovery of water damage in the garage, which caused the mold on the wall."); Dkt. No. 36-4 at 77:25–79:2 (discussing Darlene Spies prior testimony that the entire outside frame of the basement door was rotting). Darlene Spies now states that when she previously referred to mold in the house, she really meant that the growth on the wall was "crystallization," and that "mold" was simply the word the lawyers used. Dkt. No. 36-4 at 21:21–22:12. Similarly, Darlene Spies now argues that she did not know if the door was rotted or damaged by water, she only noticed that it did not close properly. Dkt. No. 36-5 at 28:6–29:7. A jury, however, would not be required to credit these explanations. While evidence of mold and rot in the past does not mean that the Spieses knew that there was mold in the house at the time they sold it to the Kawases, this evidence, when taken in conjunction with the Kawases's observations about the

34

sheetrock placement and "bright white paint" over moldy and rotted areas could raise an inference that the Spieses had actual knowledge of mold and rot in the house at the time of the sale.

If a jury infers from the Kawases's evidence that the Spieses knew there was mold and rot in the house at the time of sale, the Spieses' statement that there was no "damage resulting from . . . fungi or dry rot" at the time of sale would constitute willful concealment. If a jury infers from the Kawases's evidence that the Spieses covered the mold and rot, the Spieses's actions would constitute active concealment. Since a reasonable jury could return a verdict for the Kawases, the Spieses's motion for summary judgment is **DENIED** as to willful and active concealment of mold and rot.

### b. Passive Concealment

As discussed above, there is enough evidence to create an issue of material fact regarding whether the Spieses knew that there was mold and rot in the house at the time of the sale. Again, due to the Kawases's multiple inspections of the property, there is also enough evidence to create a jury issue on their due diligence. Therefore, neither party should obtain summary judgment on passive concealment of mold and rot. Accordingly, the Spieses's motion for summary judgment is **DENIED** as to this claim.

ii.   **The Kawases's Motion for Summary Judgment**

a. **Willful and Active Concealment**

As for their own motion for summary judgment, however, the Kawases have not presented an absence of evidence to support the Spieses's contentions regarding willful and active concealment of rot and mold. As discussed above, a jury need not credit Paul Kawas's observations that it appeared that a piece of sheetrock was placed after the surrounding sheetrock, perhaps to cover the mold that grew there. Similarly, a jury might believe Darlene Spies's testimony that she had not previously observed mold or rot in the house. Further, even if the Spieses knew about the presence of mold and rot in the past, a reasonable jury could infer from the evidence that the Spieses dealt with the issue and thus there is no indication that they knew about mold and rot at the time of the sale. Lastly, a reasonable jury could discredit the Kawases's contention about fresh paint and believe the Spieses's argument that they regularly painted the house for aesthetic reasons and to raise the value of the home, rather than with any intent to cover defects such as mold. Under those circumstances, the Spieses actions would not constitute willful or active concealment. Therefore, the Kawases are **DENIED** summary judgment on these issues.

### b. Passive Concealment

As discussed above, neither party obtains summary judgment on passive concealment of rot and mold. The Kawases's motion for summary judgment on this issue is **DENIED**.

### 4. Bulkhead and Erosion Issues

The Kawases allege that the Spieses concealed issues with the bulkhead on the Property, which caused further erosion on the Property. Dkt. No. 1 ¶ 21. The Kawases contend that, several weeks after they moved onto the Property, sinkholes began to appear in their lawn due to the bulkhead failing. Dkt. No. 1 ¶ 45. They argue the sinkholes were caused by a defective bulkhead, which the Spieses knew of and concealed by "covering over the [bulkhead] repair work with fill and sod such that the repair could not be discovered without excavation." Dkt. No. 45 at 5. The Spieses respond that the Kawases's fraud claim fails because there is no evidence that the Spieses had actual knowledge of erosion or issues with the repaired bulkhead at the time of closing. Dkt. No. 36 at 13-14, 20-24.

The Kawases also allege that the Spieses passively concealed issues with the foundation caused by the bulkhead failing and erosion. Dkt. No. 1 ¶¶ 21, 23; Dkt. No. 30 at 6, 10-13. The Kawases contend that the Spieses knew that erosion and bulkhead issues continued, yet the Spieses did not disclose the bulkhead repairs they had conducted nor any details about continuing problems. Dkt.

No. 30 at 10–13. In response, the Spieses insist that the Kawases did not exercise due diligence regarding the bulkhead and erosion issues, and therefore cannot show justifiable reliance. Dkt. No. 36 at 17–19; Dkt. No. 50 at 6–8. They argue that they disclosed their previous lawsuit, which discusses erosion issues and the installation of the bulkhead. Dkt. No. 39 at 6–7. Paul Kawas, a civil litigator, admitted that he Googled the previous case and read the records of it online, which mentioned these issues. Dkt. No. 39 at 6–7; Dkt. No. 36-1 ¶¶ 17–19; Dkt. No. 36-1 ¶¶ 44–45. After this investigation, he requested an elevation report, but he did not inquire further into the bulkhead or erosion. Dkt. No. 39 at 6. The Kawases's home inspector also specifically exempted the bulkhead and erosion from his inspection. Dkt. No. 39 at 6–7. In turn, the Kawases point to the multiple walking inspections they took of the property, the Spieses's disclosures regarding the property, and the home inspector and architect they hired. Dkt. No. 45 at 18–20.

  i.   **The Spieses's Motion for Summary Judgment**

      a. **Willful and Active Concealment**

Assessing the evidence in the light most favorable to the Kawases, there is no evidence to create a genuine issue of material fact on willful or active concealment of the bulkhead issues.

The Spieses knew there was previous erosion on the property, which prompted them to install the bulkhead. Dkt. No. 29-1 ¶ 13;

Dkt. No. 39-1 ¶ 13. The Spieses also did not follow the advice of
an expert to use helical coils when attempting to repair the
bulkhead after the neighbor's bulkhead had failed, and the Spieses
faced "catastrophic failure" of their bulkhead if nothing was done.
Dkt. No. 36-3 at 52:6-12, 53:22-161:1, 71:23-72:3, 140.

None of this evidence, however, raises the inference that the
Spieses knew that new erosion had taken place or issues with the
bulkhead remained or that they then attempted to cover it with
sod. The record indicates that at the time of the repairs, the
Spieses laid down sod which reached the bulkhead. See Dkt. No. 36-
3 at 41:2-16, 42:12-18. Since the sod was placed at the time of
the original bulkhead repairs, there is no inference that the sod
was installed in order to cover erosion or further bulkhead
failure. Cf. Napier, 855 S.E.2d at 82 (concluding that a jury
question existed as to whether the defendants actively concealed
water intrusion because there was evidence that rugs and a
refrigerator had been moved after the listing photos but before
the plaintiff's inspection). Furthermore, the fact that the
bulkhead began to fail and cause sinkholes after the Kawases moved
in does not mean that the Spieses were aware of the issue simply
because they had not repaired the bulkhead in the recommended
manner. Cf. id., 855 S.E.2d at 81 (affirming summary judgment on
the plaintiffs' flooding claims because, although the plaintiffs
obtained an affidavit from an engineer stating that drainage issues

39

on the property would be noticeable for several years, "the engineer did not opine that the 'drainage problems' caused 'flooding,' or that flooding would have been observable during periods of heavy rain"). Some evidence that the Spieses knew that their repairs would not adequately address the bulkhead issue long-term might raise the inference that they were aware of the new erosion. However, no such evidence is in the record. In contrast, the Spieses maintain that the erosion problems they experienced were in the past and they had no knowledge of the new issues. Even in the light most favorable to the Kawases, the conclusion that the Spieses knew of erosion issues that occurred between the repair of the bulkhead and the sale of the house depends on speculation, not a reasonable inference from facts. See Resnick v. Meybohm Realty, Inc., 604 S.E.2d 536, 539–40 (Ga. Ct. App. 2004) ("Guesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment." (quoting Sumter Reg'l Hosp. v. Healthworks, 589 S.E.2d 666, 669 (Ga. Ct. App. 2003))). Therefore, there is no genuine dispute of material fact regarding willful or active concealment of the bulkhead and erosion issues, and the Spieses's motion for summary judgment is **GRANTED** as to these claims.

### b. Passive Concealment

The Kawases's claim for passive concealment of the bulkhead and erosion issues, however, survives summary judgment.

Since the original owners of the house disclosed the erosion information to the Spieses and the Spieses spent large sums of money to install and repair their bulkhead to avoid further erosion, a reasonable jury could infer that the Spieses should have disclosed further information to the Kawases. Although the Spieses did disclose that they expended $250,000 to correct their erosion issue, they did not disclose information about subsequent repairs they undertook to avoid the potential for "catastrophic failure" of the bulkhead. See Dkt. No. 36-3 at 52:6–12, 53:22–161:1, 140; Dkt. No. 31-5 at 1–8 (seller's property disclosure statement and addendum). Thus, the Spieses's knowledge that the bulkhead had faced serious vulnerabilities in the past and failure to disclose that knowledge could constitute passive concealment.

Moreover, whether the Kawases exercised due diligence is an issue that should be left for the jury. Justifiable reliance is a necessary part of any fraud claim, including in each of the species of real estate transaction fraud. Brookshire v. Digby, 481 S.E.2d 250, 255 (Ga. Ct. App. 1997) ("[U]nder the various theories of fraud, due diligence must be proved in order to recover."); see also Lehman v. Keller, 677 S.E.2d 415, 417 (Ga. Ct. App. 2009) ("When . . . buyers allege fraudulent concealment, they must prove,

41

as a factor of justifiable reliance, that they could not have discovered the alleged defect in the exercise of due diligence."). Whether reliance is justifiable is often a judgment call, so "[t]he issue of whether a purchaser has acted with the requisite due diligence is generally a question for the jury." Conway v. Romerion, 557 S.E.2d 54, 58 (Ga. Ct. App. 2001); see also Stephen A. Wheat Trust, 754 S.E.2d at 645 ("We have frequently cautioned that . . . 'whether the buyer could have protected himself by the exercise of proper diligence [is], except in plain and indisputable cases, [a] question[ ] for the jury.'" (quoting Hudson, 598 S.E.2d at 813)). In particular, where the underlying problem involves "water leaks or other latent defects" and is therefore "not obvious or manifested through stains or other signs of damage," Georgia courts typically hold that the defect "[is] not discoverable through due diligence" "absent circumstances or other factors causing the defects to become discoverable." Brookshire, 481 S.E.2d at 255; cf. Stephen A. Wheat Trust, 754 S.E.2d at 645-46 (finding a fact issue on justifiable reliance where the problem with the property involved an underground sewer and therefore could not have been discovered with ordinary due diligence until the buyer was forced to excavate years later). Here, the bulkhead issue was latent because indications of damage such as the sinkholes did not appear until after the Kawases occupied the property. Dkt. No. 29-1 ¶ 45; Dkt. No. 39-1 ¶ 45.

In some instances, a buyer can fail to exercise due diligence as a matter of law, but this is not one of those cases. See Najarian Capital, LLC v. Clark, 849 S.E.2d 262, 268 (Ga. Ct. App. 2020) ("While questions of due diligence often must be resolved by the trier of fact, that is not always the case. One may fail to exercise due diligence as a matter of law." (quoting Lehman v. Keller, 677 S.E.2d 415, 417–18 (Ga. Ct. App. 2009))); Gibson v. Home Folks Mobile Home Plaza, Inc., 533 F. Supp. 1211, 1218 (S.D. Ga. 1982) (collecting cases where buyers failed to exercise due diligence as a matter of law). Failure to exercise due diligence as a matter of law typically occurs in three instances: (1) when damage is "readily apparent," i.e., the buyer blindly relies on the seller's representations; (2) the buyer has reason to suspect a problem and the means to discover it, or (3) the buyer relies on a representation that was unenforceable at the time it was made. See, e.g., Delk v. Tom Peterson Realtors, Inc., 469 S.E.2d 741, 742–43 (Ga Ct. App. 1996) ("[T]he uncontroverted evidence compels the conclusion that plaintiffs did not exercise due diligence since they did not conduct any inspection of the premises despite having encountered some of the readily apparent defects while viewing the home."); Ben Farmer Realty Co. v. Woodard, 441 S.E.2d 421, 422–23 (Ga. Ct. App. 1994) (finding that fire damage in an attic was readily discernable where "[t]he house at issue was vacant residential property in obvious dilapidated condition," and the

buyer inspected the house twice and knew she could have accessed and inspected the attic); Fann v. Mills, 546 S.E.2d 853, 858 (Ga. Ct. App. 2001) (finding no reasonable reliance where the contract contained a merger clause barring reliance on any representations or warranties not made in the contract).

The Spieses contend this is the second sort of case because the Kawases knew about the prior lawsuit and therefore should have anticipated potential bulkhead and erosion issues and investigated accordingly. Dkt. No. 36 at 17–18. While a jury may find this argument convincing, there is not enough evidence to merit summary judgment. The prior litigation reveals only that the Spieses discovered an erosion problem on the property after buying it and installed a bulkhead in response, not that they were aware of subsequent erosion after the bulkhead was installed. Spies, 169 F. Supp. 3d at 1372–73. The Kawases contend that they understood the prior litigation to mean that the bulkhead was successfully installed, and the erosion issues had been addressed. Dkt. No. 30 at 18. Thus, in the light most favorable to the Kawases, they had no reason to suspect that issues continued. A jury could credit this rationale and find that the decision demonstrates that erosion "was in the past and had been resolved." Stephen A. Wheat Trust, 754 S.E.2d at 646. Therefore, the Spieses's motion for summary judgment is **DENIED** as to passive concealment of bulkhead and erosion issues.

### ii.   The Kawas's Motion for Summary Judgment

#### a. Willful and Active Concealment

As discussed above, since there is no genuine dispute of material fact as to the Spieses's willful or active concealment of bulkhead and erosion issues, the Kawases's claims fails, and their motion for summary judgment on these claims is **DENIED.**

#### b. Passive Concealment

Next, the Kawases do not obtain summary judgment on passive concealment of the bulkhead and erosion issues. The Spieses argue that the expert's recommended use of helical coils represented simply one opinion, not an absolute requirement. Dkt. No. 36 at 21. As most people do with contractor work, the Spieses obtained other opinions and ultimately decided to use the services of other professionals who used tie-backs, which they contend could also adequately address the issue. Id. Thus, the Spieses believed they had repaired the bulkhead and had no knowledge of subsequent issues with the bulkhead and erosion. On the issue of due diligence, a jury may also believe that the Spieses's disclosure of their prior lawsuit should have alerted the Kawases to a potential issue with the bulkhead and erosion which required further investigation. Afterall, Paul Kawas Googled the opinion and requested an elevation report that the opinion mentioned. Dkt. No. 36-1 ¶¶ 44-45; Dkt. No. 46 ¶¶ 44-45; Dkt. No. 36-1 ¶ 47; Dkt. No. 46 ¶ 47.  In sum, this is not the sort of "plain and indisputable case[]" for which

summary judgment is appropriate, so the question must go to the jury. Stephen A. Wheat Trust, 754 S.E.2d at 646–47. The Kawases's motion for summary judgment as to passive concealment of bulkhead and erosion issues is **DENIED**.

### 5. The Hole

Finally, the Kawases contend that the Spieses passively concealed "an open 2' diameter hole in the home's third level floor which was behind a central air conditioning air intake register and a filter." Dkt. No. 1 ¶ 20.

#### i.   The Spieses's Motion for Summary Judgment

Whether the Spieses knew about the hole presents a genuine issue of material fact. The Kawases learned about the hole from a contractor who had created the hole in the house when the Spieses owned it. Dkt. No. 35 at 41:157:16–22. Taking all inferences in favor of the Kawases, a jury might find it unlikely that the contractors simply failed to mention the large hole to the Spieses—even if someone else had been renting the home at the time. Therefore, a jury could reasonably find that the Spieses knew about the hole and did not disclose it to the Kawases, which would constitute passive concealment. The Spieses's motion for summary judgment on this issue is **DENIED**.

#### ii.   The Kawases's Motion for Summary Judgment

The Kawases, however, have not demonstrated that there is no issue of material fact that the Spieses knew that the hole existed.

The Spieses deny that they knew about the hole noting that the hole is located behind a large, generally immobile air conditioning unit. Dkt. No. 36 at 17. ithout any indication that something was amiss behind the air conditioning unit, the Spieses had no reason to attempt to check behind the machine. From these facts a jury could reasonably find the Spieses did not know about the hole. Without knowledge, the Spieses could not have committed passive concealment. Thus, the Kawases's motion for summary judgment on this issue is **DENIED**.

### B. Attorney Fees

#### 1. O.C.G.A. § 13-6-11

The Spieses also seek summary judgment on the Kawases's bid for attorney fees under O.C.G.A. § 13-6-11. Dkt. No. 36 at 24-25; see also O.C.G.A. § 13-6-11 (2022) ("[W]here the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the *jury* may allow them." (emphasis added)). Under Georgia law, "[a]ttorney fees cannot be awarded by a trial court pursuant to O.C.G.A. § 13-6-11 at the summary-judgment stage of proceedings because the very language of the statute prevents a trial court from ever determining that a claimant is entitled to attorney fees as a matter of law . . . ." Tuggle v. Ameris Bank, 872 S.E.2d 1, 7-8 (Ga. Ct. App. 2022) (quoting Sherman v. Dickey, 744 S.E.2d 408, 412 (Ga. Ct. App. 2013)); see also Covington Square Assocs., LLC

v. Ingles Markets, Inc., 696 S.E.2d 649, 651 (Ga. 2010) (stating that "both the liability for and amount of attorney fees pursuant to O.C.G.A. § 13-6-11 are solely for the jury's determination"). Thus, this Court does not have the authority to grant attorney fees under O.C.G.A. § 13-6-11 at this stage.[10]

**2. Fees Under the Agreement**

Lastly, the Spieses's bid for attorney fees and expenses under the Agreement, dkt. no. 36 at 25–26, fails because they are not currently prevailing parties. See Dkt. No. 36-6 at 260 (providing that "the non-prevailing party" in "any litigation or arbitration arising out of [the purchase and sale agreement . . . shall be liable to the prevailing party."). Since neither party has currently prevailed in the lawsuit, neither party can obtain summary judgment on this issue. Thus, to the extent the Spieses move for summary judgment on this issue, their motion is **DENIED**.

**CONCLUSION**

For the foregoing reasons, the Kawases's motion for partial summary judgment, dkt. no. 29, is **DENIED**. The Spieses's motion for summary judgment, dkt. no. 36, is **GRANTED** as to the Kawases's claims for (1) active concealment of water intrusion, (2) active

---

[10] The Kawases also pled for punitive damages under O.C.G.A. § 51-12-5.1 (2022). Punitive damages may only be awarded where a party has been awarded compensatory damages. S. Gen. Ins. Co. v. Holt, 416 S.E.2d 274, 277–78 (1992). Since the Spieses have not been granted summary judgment on the issue of liability, they cannot obtain summary judgment on the Kawases's punitive damages claim.

concealment of foundation damage, (3) willful concealment of bulkhead and erosion issues, (4) active concealment of bulkhead and erosion issues and **DENIED** as to all other claims.  Finally, to the extent Plaintiffs allege any claims against Dudley Do SSI, LLC, those claims are **DISMISSED** per the parties' stipulation. The remaining parties are **ORDERED** to file a proposed consolidated pretrial order by December 9, 2022.

      **SO ORDERED** this 30th day of September, 2022.


_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA